**AFFIRM; Opinion issued February 20, 2013**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

————————————————

### No. 05-11-01267-CR
### No. 05-11-01283-CR

————————————————

### DELVIN BERNHARD SIMMONS, Appellant

### V.

### THE STATE OF TEXAS, Appellee

═══════════════════════════════════════════════════

### On Appeal from the 204th Judicial District Court
### Dallas County, Texas
### Trial Court Cause Nos. F10-53437-Q and F10-53438-Q

═══════════════════════════════════════════════════

## MEMORANDUM OPINION

Before Justices Bridges, O'Neill, and Murphy
Opinion By Justice Bridges

Appellant Delvin Bernhard Simmons appeals his convictions for possession of a controlled substance (cocaine in No. F10-53437-Q and heroin in No. F10-53438-Q) with intent to deliver. In three issues, appellant contends: (1) there was insufficient evidence to prove that he committed the offense of possession of a controlled substance (cocaine) with intent to deliver; (2) the trial court erred in failing to instruct the jury on the lesser included offense of possession of cocaine;[1] and (3) the prosecutor was permitted to make an improper argument at the punishment phase of trial. We affirm.

---

[1] Although appellant has submitted separate briefing for each conviction, Issues 1 and 2 of both briefs address his conviction for possession of a controlled substance (cocaine) with intent to deliver only. Although we conclude the analysis is the same for both convictions, we do not specifically address his conviction for possession of a controlled substance (heroin) in our discussion of Issues 1 and 2.

BACKGROUND

Trovoyia Henry testified she was living with appellant on March 18, 2010. Henry began living with appellant two years previously at the age of 17. Appellant and Henry lived together in different motels.

They began to argue on March 18 when appellant told her he thought she had something to do with the radios in two of his cars being stolen. They also argued because appellant's children were picking on Henry's son. Five of appellant's children were at the motel that day.[2] Appellant tried to take Henry's phone, but when she refused, appellant started hitting her in the face. Henry scratched and pushed appellant. When Henry fell onto the couch, appellant choked her with one hand. Henry said she would call the police and when she tried to grab the phone in the room, appellant ripped the phone out of the wall. Henry grabbed her son and ran out of the room.

She ran to the room next door and called 911. Henry spoke with the police and told them what happened. She saw appellant had left in his gray Taurus before the police arrived. When the police asked how appellant paid for the motel rooms, Henry said appellant sold drugs. She indicated she had never actually seen appellant sell drugs, but he never went to a job and always had money. Henry explained appellant had no bank account, but kept his cash inside his wallet and in a rubber band. She said he "always had lots of money." Appellant's children told Henry that appellant sold drugs, and Henry knew the people he hung around "did drugs." She also told the police appellant had guns and often slept with a gun beside him. She later testified the only gun of appellant that she ever saw was a long, black shotgun, but appellant did not have the gun at the time of the altercation with her.

Officer Shawn Warren with the Dallas Police Department testified he was on patrol on March 18, 2010 when he received a call regarding a major disturbance with violence. The officers talked with Henry for two to three hours. Her bruises and injuries were consistent with what she told them had happened to her. Appellant was not at the scene, and Officer Warren did

---

[2] Appellant testified he was 39 and had a total of 16 children.

not speak with appellant.

Officer Lashawn Douglas with the Dallas Police Department testified that, on March 18, 2010, he responded to a call regarding a disturbance with violence at the Budget Suites on Walton Walker.  Douglas said the police had made several arrests involving narcotics at the same motel over the three or four months prior to the date of this incident.  Douglas also stated he was familiar with the motel because of the drug problems there.  When the police asked Henry the name of the person who assaulted her, Douglas entered it into the computer and came back with a warrant on appellant.  Douglas and his partner searched for appellant, but they did not find him, so they returned to the motel.

When he returned to the motel, Douglas saw several children inside the motel room, one of which appeared to be a teenager using the telephone.  When asked, the teen told Douglas she was speaking to her father, appellant.  Douglas then got on the phone and asked appellant if he was going to come to the motel to take care of the other children. In response, appellant cursed the officer and said he was not coming back.  Douglas then indicated he was left with no choice but to call CPS.  Douglas said appellant responded: "F you.  I'm not scared.  I got guns, too.  I'm not scared to shoot it out."  At that point, Douglas hung up so as not to escalate the situation and called his deployment unit, advising them what appellant had said.

Officer Jeffrey Eggleston testified that, on March 18, 2010, he received a call from Douglas about his conversation with appellant.  Eggleston went to the motel in his undercover vehicle, waited for appellant's friends to pick up his clothing and then followed when they left the motel in a red Suburban.  Undercover officers followed the friends to a house in Oak Cliff and then saw appellant drive up to the house in a gray Taurus.  The officers watched appellant go into the house and come out and get into a car.  Appellant then drove off, switching lanes and driving fast, so Eggleston called in uniformed officers in squad cars to make a traffic stop.  The officers were unable to pull appellant over, and a chase ensued.

Eggleston did not participate in the chase, but went to the scene when appellant was

apprehended. Eggleston explained a digital scale, used to weigh drugs, was later found in appellant's car. Prior to trial, Eggleston picked up the drugs in the Police Department Property Room and brought them to court. State's Exhibit 22 shows Eggleston brought to court a bag with white powder cocaine, a bag with several heroin capsules and a small black scale.

Officer Scott Jay of the Dallas Police Department testified that, on March 18, 2010, he was called to make a traffic stop on a gray Taurus. Jay received information, indicating appellant had an active warrant and was possibly armed with a gun. Jay, in contact with other police officers, was able to get behind the gray Ford Taurus driven by appellant. Once Jay activated his lights, a video recording was also activated. Appellant did not stop, but wove in and out of traffic and accelerated at a high rate of speed. For most of the chase, appellant was going over 80 miles per hour, reaching speeds up to 114 miles per hour.

Appellant eventually bounced over a curb and hit a retaining wall in a resident's yard. Due to the collision, he fled from the passenger-side door and started running. Jay hit appellant as he came out of the Taurus. Appellant then pushed off the hood of the police car and ran down the street. Jay followed appellant in his squad car until appellant ran between two houses. Jay then followed him on foot.

Jay kept his flashlight fixed on appellant, watching his hands because appellant possibly had a weapon. As appellant approached a wooden fence that was about 7 feet high, Jay observed appellant throw something into the grass. Appellant went over the fence and dove head-first onto the ground. As he picked himself up, Jay saw appellant toss a baggie into the residential backyard. Jay testified he never lost sight of appellant from the time he got out of his car until the time he was arrested.

Jay testified appellant then turned in an aggressive, fighting stance as he faced Jay. Jay ran toward appellant and pushed him, so appellant fell down and Jay fell on top of him. Appellant struggled with Jay, who was trying to get control of appellant's hands. Officer Jerry Smith of the Dallas Police Department arrived, giving appellant loud verbal commands to stop resisting.

Appellant continued to kick and try to hit the officers. Smith used his baton to hit appellant twice in the thigh to gain compliance. Smith also hit Jay once in the wrist with the baton. When the officers finally handcuffed appellant, they searched him, but found no weapons or anything else. Other officers arrived, and Eggleston walked appellant back to the squad car.

Jay then went to look for the objects appellant had thrown during the chase. The police found two baggies on the ground right before appellant had jumped on top of the wooden fence and another where he landed. The first two baggies had a white powdery substance and the third baggie contained capsules. Jay testified that, based on what he saw, the drugs did not appear to be for personal use, noting it would be much more than what an average individual would be able to consume.

Jay identified States Exhibit 17 as the drug evidence bag, which is marked with his name and date the drugs were found. State's Exhibit 17 contains State's Exhibit 16, two baggies of white powder, and State's Exhibit 15, one baggie of capsules. Jay positively identified State's Exhibits 15 and 16 as the substances he picked up from the yard on the night appellant was arrested. Jay did not place an identifying mark on Exhibits 15 and 16, but recognized them as being the baggies he collected that night.

The car chase was recorded on the video. Because the camera was mounted to the squad car, it did not record the foot chase or appellant being brought back after he was arrested. The video reflected that, during the chase, Jay was going up to 114 miles per hour on three occasions and over 100 miles per hour for several minutes during the chase. When the video was slowed down at the moment appellant got out of his car, Jay believed he could see a baggie of cocaine in appellant's left hand.

Officer Smith testified that, on March 18, 2010, he was called to make a traffic stop on a Taurus. The suspect was wanted for a violent crime and was possibly armed with a handgun. A high speed chase ensued. When Jay activated his lights, Smith explained appellant accelerated at a high rate of speed and began to rapidly switch lanes. Smith remained behind Jay for the

duration of the chase and kept the dispatcher informed of the travel speeds and roadways. When the car chase came to an end, Smith saw appellant running from his vehicle. Smith explained he got hung on a fence, but Jay continued chasing appellant. Smith saw appellant go head first over a fence. When Smith came up to the top of the final fence, he saw Jay and appellant on the ground fighting.

Smith said appellant looked like he was about to swing at Jay and, for that reason, he delivered one strike to appellant's thigh. Smith said he tried to strike appellant a second time, but appellant was rolling, so he hit him in the buttocks and lower back. Smith tried to hit appellant a third time, but accidentally struck Jay in the wrist. Because appellant had rolled onto his stomach, the officers were able to gain control of appellant's hands and handcuff him. Smith and Jay then walked appellant back to the squad cars and passed him to the other officers.

Smith and Jay then searched the area where Jay had seen appellant throw something, and they found cocaine on one side of the fence and heroin on the other. Smith testified he did not see appellant throw the drugs. The officers then gave the drugs to another officer at the scene who was going to the jail.

Officer Stewart of the Dallas Police department was also called to the chase on March 18, 2010. He waited on the wrecker for the Taurus and transported the recovered drugs to the Lew Sterrett jail and weighed them. The drugs were given to him by Jay. Stewart said that, after he weighed them, he placed them in the Lew Sterrett drug lockbox. Stewart processed appellant's Taurus and found a digital scale in the passenger floorboard. He also said he placed the scale and drugs all together in a sealed drug bag and put his badge number on it. Stewart then created an inventory sheet linked to the case, which was offered into evidence without objection.

Officer Brendan Gadomski of the Dallas Police Department testified he worked with Stewart in depositing the drugs at the Lew Sterrett jail. He helped to heat seal the drugs into a bag and then put the bag into the lock box. Gadomski's name and badge number are on the drug bag, State's Exhibit 17. The bag also contains appellant's name and a service number assigned to

his case.

Deborah Floch, a drug chemist at the Southwestern Institute of Forensic Sciences, testified that State's Exhibit 19 is a copy of her report, which was received without objection. Floch testified the drug bag, State's Exhibit 17, had a bar code label with a unique number on it by the lab, the same number that was on her report. Floch tested the contents of the two baggies, which contained white powder weighing 50 grams, with 11.9 grams of cocaine in that powder. Floch also testified she tested 107 clear capsules containing a brown powder that weighed 11.0 grams, with 0.87 grams of heroin in that powder. Floch explained the weight of the cocaine was between 4 and 200 grams and the weight for the heroin was also between 4 and 200 grams.

Officer Barry Ragsdale testified that, after 7 years with the DEA, he became the primary field training officer for new detectives entering the narcotics division. He explained that the street value of the cocaine here was $100 gram, or $5,000 for the 50 grams. Ragsdale explained that State's Exhibit 18, a digital scale, was used by drug traffickers or drug dealers as a tool of the trade. Ragsdale opined the 50 grams of cocaine would not be an amount for personal use.

Ragsdale also estimated the 11 grams of heroin was worth $1,100, about $100 per gram, similar to the cocaine. Ragsdale indicated appellant's possession of large amounts of cocaine and heroin and the drug scale alone were "indicative of someone that's involved in the drug business." Ragsdale added he has chased drug dealers, and they will throw things down when being chased by the police.

Appellant, testifying on his own behalf, admitted he had two prior convictions: (1) a 1989 conviction for possession of cocaine with intent to deliver and (2) a 2005 family violence conviction.[3] Appellant's last job was working at Pilgrim's Pride in 2005. He said he and some of his children were staying in a friend's room at Budget Suites. Appellant knew there was drug dealing and prostitution at the motel. Appellant stated he only owned one car, a Chrysler Sebring, and that the Taurus had been borrowed from a friend. Appellant testified Trovoyia started

---

[3] The family violence was committed against Shaketa Henry, Trovoyia Henry's aunt.

pushing him first by snatching the phone from him, and then she hit herself in the mouth with her own hand. Appellant admitted punching Trovoyia three times, but denied choking her.

Appellant denied having cocaine and heroin in his possession that night and further denied having sold drugs since he got out of jail in 1989. He stated he did not pull over when the uniformed officers turned on their lights because he "knew what they really intentions [sic] was to do," which was to kill him. Appellant said he drove fast through neighborhoods for "survival" and said he held car keys with a yellow tag when he got out of his car.

A jury convicted appellant of possession of a controlled substance (cocaine) in an amount of 4 grams or more but less than 200 grams with intent to deliver and possession of a controlled substance (heroin) in an amount of 4 grams or more but less than 200 grams with intent to deliver. Appellant pled true to the enhancement paragraph of the indictments and the jury set punishment at 50 years' imprisonment in each case.

## ANALYSIS

### I. Sufficiency of the Evidence

In his first issue, appellant contends the evidence is insufficient to prove he committed the offense of possession of a controlled substance with intent to deliver, to wit: cocaine in an amount of 4 grams or more but less than 200 grams, as alleged in the indictment. In reviewing a challenge to the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010) (plurality op.). We are required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 326 ("a court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

### A.    *Chain of Custody*

Appellant first challenges the sufficiency of the evidence regarding the chain of custody, contending "Officer Jay did not mark the bags to begin a proper chain of custody."   Without Jay's marking, appellant contends there is no chain of custody for the drugs leading back to him.   We disagree.

As already noted, Officer Jay testified he witnessed appellant throw something while he was being chased.   Once appellant was secured, Jay went back to look for the thrown objects and found the three baggies.   He located two of the baggies before the fence and one on the other side of the fence where appellant had landed.   Officer Jay identified State's Exhibit 17 as the drug evidence bag, which was marked with his name and the date the drugs were found.   Jay stated State's Exhibit 17 contained State's Exhibits 16 and 15, which contained the drugs he found on the ground the night of appellant's arrest.   Jay explained he did not mark the baggies, but recognized them as the baggies he collected that night.

Officer Stewart testified Jay gave him the drugs at the scene of appellant's arrest, and that he also found a digital scale, State's Exhibit 18, on the floorboard of appellant's Taurus.   Stewart then took the drugs to Lew Sterrett, placed the baggies in a drug bag, which he identified as State's Exhibit 17, before sealing the drug bag and placing his initials and badge number on the bag.

Officer Gadomski testified he helped Stewart heat seal the drugs into the drug bag, State's Exhibit 17.   Gadomski's name and badge number are on the exhibit.   The bag also contained appellant's name and a service number assigned to his case.

Deborah Floch then testified State's Exhibit 17 had a bar code label with a unique number placed on it by the lab, and that same number is on her report.   She testified two of the baggies contained cocaine, while the other contained heroin.

Eggleston testified that, prior to trial, he picked up the drugs in the Police Department Property Room and brought them to court.   State's Exhibit 22 shows Eggleston brought to court "a bag with white powder cocaine, [a] bag with several heroin capsules and a small black scale."

A chain of custody is sufficiently authenticated when the State establishes the beginning and the end of the chain, particularly when the chain ends at a laboratory. *Martinez v. State,* 186 S.W.3d 59, 62 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd). Absent proof of tampering, most problems with the chain of custody do not affect the admissibility of evidence, but rather go to the weight of the evidence. *Lagrone v. State,* 942 S.W.2d 602, 617 (Tex. Crim. App.1997). The State need only prove the beginning and end of the chain of custody; it is not required to show a moment-by-moment account of the location of evidence from the time of seizure. *Shaw v. State,* 329 S.W.3d 645, 654 (Tex. App.–Houston [14th Dist.] 2010, pet. ref'd). Thus, given the record before us, we conclude the evidence is sufficient to establish the proper chain of custody. *See id.*

B.      Possession of Cocaine

Appellant next argues the evidence was insufficient to convict him of possession of a controlled substance (cocaine) with intent to deliver. In order to obtain a conviction, the State was required to prove beyond a reasonable doubt that appellant knowingly manufactured, delivered, or possessed with intent to deliver a controlled substance listed in Penalty Group 1. TEX. HEALTH & SAFETY CODE ANN. § 481.112 (West 2010). Cocaine is among the substances included in Penalty Group 1. *See id.* at § 481.102 (3)(D).

As noted above, Officer Jay testified he had his flashlight on appellant, watching his hands because appellant possibly had a weapon. As appellant approached a wooden fence that was about 7 feet high, Jay observed appellant throw something into the grass. When appellant went over the fence, Jay saw appellant toss a baggie of drugs into the residential backyard. Jay testified he never lost sight of appellant from the time he got out of his car until the time he was arrested. During trial, when the video was slowed down at the moment appellant got out of his car, Jay believed he could see a baggie of cocaine in appellant's left hand.

After the encounter with appellant had ended, Officer Jay returned to where he saw appellant toss the baggies and retrieved them. The police found two baggies right before the appellant had jumped on top of the wooden fence and another where he landed. The first two

baggies had a white powdery substance and the third baggie contained capsules. Officer Smith confirmed he and Jay searched the area where Jay had seen appellant throw something, and they found cocaine on one side of the fence and heroin on the other.

The evidence shows Deborah Floch tested the contents of the two baggies, which contained white powder, and concluded there was cocaine in that powder. Floch also testified she tested 107 clear capsules containing a brown powder that contained heroin. Floch explained the weight of the cocaine was between 4 and 200 grams and the weight for the heroin was also between 4 and 200 grams.

Although appellant denied having cocaine and heroin in his possession that night, the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 326. We conclude the evidence is sufficient to show appellant possessed cocaine in an amount between 4 and 200 grams. *See Brooks v. State*, 323 S.W.3d at 894-95.

C.      Intent to Deliver

We next turn to the question of whether the evidence was sufficient to prove appellant's intent to deliver the cocaine. Intent to deliver may be established through circumstantial evidence. *See Jordan v. State,* 139 S.W.3d 723, 726 (Tex. App.–Fort Worth 2004, no pet.). Furthermore, "intent to deliver is a question of fact for the jury to resolve, and it may be inferred from the acts, words, or conduct of the accused." *Taylor v. State,* 106 S.W.3d 827, 831 (Tex. App.–Dallas 2003, no pet.). Testimony by experienced law enforcement officers may be used to establish a defendant's intent to deliver. *Robinson v. State,* 174 S.W.3d 320, 331 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd). We may consider several factors in determining such intent, including the nature of the location where the defendant was arrested, the quantity of drugs the defendant possessed, the manner of packaging the drugs, the presence or absence of drug paraphernalia (for use or sale), whether the defendant possessed a large amount of cash in addition to the drugs, and the defendant's status as a drug user. *Jones v. State,* 195 S.W.3d 279, 288 (Tex. App.–Fort Worth 2006) (op. on reh'g), *aff'd,* 235 S.W.3d 783 (Tex. Crim. App.2007); *Jordan,* 139

S.W.3d at 726. "The number of factors present is not as important as the logical force the factors have in establishing the elements of the offense." *Moreno v. State,* 195 S.W.3d 321, 326 (Tex. App.–Houston [14th Dist.] 2006, pet. ref'd) (op. on reh'g).

The record before us shows Henry, appellant's girlfriend, testified when the police asked how appellant paid for the motel rooms, she said he sold drugs. She indicated she had never actually seen appellant sell drugs, but he never went to a job and always had money. Henry explained appellant had no bank account, but kept his cash inside of a rubber band. She said he "always had lots of money." Appellant's children told Henry that appellant sold drugs, and Henry knew the people he hung around "did drugs." She indicated appellant had multiple cars and also told the police appellant had guns and often slept with a gun beside him.

Officer Douglas said the police had made several arrests involving narcotics at the same motel over the three or four months prior to the date of this incident. Douglas also stated he was familiar with the motel because of the drug problems there.

Officer Stewart processed appellant's Taurus and found a digital scale in the passenger floorboard. Officer Ragsdale explained that State's Exhibit 18, a digital scale, was used by drug traffickers or drug dealers as a tool of the trade. Ragsdale opined the 50 grams of cocain would not be an amount for personal use. Ragsdale also indicated appellant's possession of large amounts of cocaine and heroin and the drug scale alone were "indicative of someone that's involved in the drug business." Ragsdale added he has chased drug dealers, and they will throw things down when being chased by the police. Further, Officer Douglas testified he was familiar with the hotel due to the drug problems there.

Appellant, on the other hand, testified he only owned one car, a Chrysler Sebring, and that the Taurus had been borrowed from a friend. He admitted his last job was working at Pilgrim's Pride in 2005 and that he knew there was drug dealing and prostitution at the motel. Appellant, however, denied having cocaine and heroin in his possession that night and further denied having sold drugs since he got out of jail in 1989.

Based on the record before us, we conclude the evidence is sufficient to show appellant possessed cocaine with intent to deliver. *See Jackson*, 443 U.S. at 326; *Brooks*, 323 S.W.3d at 894-95. We overrule appellant's first issue.

## II.    Lesser Included Offense

Appellant next contends the trial court erred in failing to instruct the jury on the lesser included offense of possession of cocaine. A defendant's own testimony that he committed no offense, or testimony which otherwise shows that no offense occurred at all, is not adequate to raise the issue of a lesser-included offense. *Lofton v. State*, 45 S.W.3d 649, 652 (Tex. Crim. App. 2001). A two-prong test is to be met before a jury charge on a lesser included offense must be given: first, the lesser included offense must be included within the proof necessary to establish the offense charged, and, second, some evidence must exist in the record that if the defendant is guilty, he is guilty only of the lesser offense. *See Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993); *Aguilar v. State,* 682 S.W.2d 556, 558 (Tex. Crim .App.1985) (citing *Royster v. State,* 622 S.W.2d 442 (Tex. Crim. App.1981)).

Here, the trial court denied appellant's request for an instruction on the offense of possession of cocaine, noting appellant denied any possession of cocaine and the evidence did not show appellant was guilty only of possession of cocaine. As indicated in our discussion of appellant's first issue, we agree with the trial court. The evidence was sufficient to prove appellant committed possession of cocaine with intent to deliver and, consequently, the evidence did not show appellant was guilty only of possession of cocaine. Thus, the trial court did not err in denying appellant's requested instruction on the lesser included offense of possession of cocaine. *See Rousseau*, 855 S.W.2d at 672. We overrule appellant's second issue.

## III.    Jury Argument

In his third issue, appellant argues the prosecutor was permitted to make an improper argument at the punishment phase of trial and specifically points us to two portions of the State's argument. First, appellant complains of the prosecutor's hypothetical exchange between

penitentiary inmates and appellant:

> The two questions are: What did you do? What did you get? [Appellant's] answer's going to be as smug as it was on the witness stand. Beat up my girlfriend. Beat up my girlfriend, dealt drugs and then I ran from the police after I threatened them. And I was on this hundred mile per hour chase. And you should have seen my driving. You should have seen my driving. They couldn't catch me. It's because I wrecked out was the only reason they caught me because I wrecked out against somebody's house. Then I ran from the police. I threw my drugs down, jumped over the fence like a gymnast, then I got up, and I fought it out with those officers. That's going to be his answer to everybody.

Appellant also complains of the following statement made by the prosecutor:

> Ladies and gentlemen, whatever answer you give, whatever you come back with, will echo throughout Dallas County, throughout the prison system and throughout history of what is this type of behavior worth here in Dallas County.

At trial, however, appellant failed to object to either of these portions of the prosecutor's argument. To preserve error, an objection must be timely. TEX. R. APP. P. 33.1(a)(1). To be considered timely, the objection must be made when the grounds for the objection becomes apparent. *Neal v. State*, 256 S.W.3d 264, 279 (Tex. Crim. App. 2008). If the grounds for the objection have not yet arisen, the objection is premature and the trial court properly overrules the objection as not well-taken. *Felder v. State*, 848 S.W.2d 85, 96 (Tex. Crim. App. 1992). If the ground later becomes apparent, the party must re-urge his objection to preserve error. *Id*.; *Bushell v. Dean*, 803 S.W.2d 711, 711-12 (Tex. 1991). Here, appellant failed to object to these portions of the prosecutor's argument.

Furthermore, when appellant did object, he objected to the prosecutor's statement, "Everybody that sees him is going to ask him these two questions."[4] Appellant objected that it was "not in evidence," and the trial court overruled the objection. However, on appeal, appellant's complaint does not match his objection at trial, now arguing the prosecutor's argument was "improper." For an issue to be preserved for appellate review, the specific ground identified and presented to the trial court for a ruling must be the same as the ground alleged in a point of error on appeal. *DeBlanc v. State*, 799 S.W.2d 701, 718 (Tex. Crim. App. 1990). Because appellant

---

[4] This statement took place prior to the portions complained of on appeal.

failed to preserve his complaints now raised on appeal, we overrule appellant's third issue. *See*

TEX. R. APP. P. 33.1.

Having overruled appellant's issues, we affirm the judgment of the trial court.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
111267F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DELVIN BERNHARD SIMMONS,
Appellant

No. 05-11-01267-CR          V.

THE STATE OF TEXAS, Appellee

Appeal from the 204th Judicial District Court
of Dallas County, Texas. (Tr.Ct.No.
F10-53437-Q).
Opinion delivered by Justice Bridges,
Justices O'Neill and Murphy.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered February 20, 2013.


/David L. Bridges/
DAVID L. BRIDGES
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DELVIN BERNARD SIMMONS, Appellant

No. 05-11-01283-CR      V.

THE STATE OF TEXAS, Appellee

Appeal from the 204th Judicial District Court of Dallas County, Texas. (Tr.Ct.No. F-10-53438-Q).
Opinion delivered by Justice Bridges, Justices O'Neill and Murphy.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered February 20, 2013.


/David L. Bridges/
DAVID L. BRIDGES
JUSTICE